## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **Rick Chen, an Individual, Thomas Lau, an Individual, Tony Lau, an Individual, Harry Tang, an Individual,**<br><br>**Plaintiffs,**<br><br>**Marcin Chojnacki, an Individual, Laurena Mikosz, an Individual, Kendall Murphy, an Individual, 1st Midwest Financial, Inc., an Illinois Corporation, Chase Real Estate, LLC, an Illinois Limited Liability Company, First National Financial Inc., an Illinois Corporation; FNBO Property Management LLC, an Illinois Limited Liability Company, Kathleen Long, an Individual, and Rachel Irwin, an Individual.** | **Case No.**<br><br>**Judge:**<br><br>**Magistrate:** |

## **COMPLAINT**

NOW COME  the  Plaintiffs, Rick Chen, Thomas Lau, Tony Lau, and Harry Tang, by and through their attorneys, Gaspero & Gaspero, Attorneys at Law, P.C., and in complaining against Marcin Chojnacki, an Individual, Laurena Mikosz, an Individual, First National Financial, Inc. an Illinois Corporation, Kathleen Long, an Individual, Kendall Murphy, an Individual, 1st Midwest Financial, Inc., an Illinois Corporation, Chase Real Estate, LLC, an Illinois Limited Liability Company,  FNBO Property Management LLC, an Illinois Limited Liability Company, and Rachel Irwin, an individual, allege as follows:

## JURISDICTION

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that the Plaintiff asserts claims arising under the Racketeer Influenced and Corrupt Organizations Act 18, U.S.C. § 1962.

This Court has jurisdiction over this action pursuant to 28 U.S. Code § 1332(a)(1) whereas the Plaintiffs is a citizen of the State of California, and the Defendants are citizens of Illinois and Delaware. The amount in controversy, exclusive of costs, exceeds $75,000.

This Court has supplemental jurisdiction over the Plaintiff's state law claims, pursuant to 28 U.S. § 1367.

## VENUE

Venue is proper in this District pursuant 18 U.S.C. § 1965 and 28 U.S. Code § 1391(c)(2), whereas multiple Defendants are residents of Illinois and the real estate at issue is located in Northern Illinois.

Venue is proper in this District pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this judicial district and reside in this district.

## PARTIES

1.     Plaintiff Rick Chen ("Rick"), an individual, is a California resident.

2.     Plaintiff Thomas Lau ("Thomas"), an individual, is a California resident.

3.     Plaintiff Tony Lau ("Tony"), an individual, is a California resident.

4.     Plaintiff Harry Tang ("Harry"), an individual, is a California resident.

5.     Defendant Marcin Chojnacki ("Chojnacki"), an individual, is an Illinois licensed real estate broker and an Illinois resident.

6. Defendant Laurena Mikosz ("Mikosz"), an individual, is an Illinois licensed real estate broker and an Illinois resident.

7. Defendant Kendall Murphy ("Murphy"), an individual, is an Illinois resident.

8. Defendant 1st Midwest Financial, Inc., is an Illinois Corporation and a citizen of Illinois in that its principal place of business is in the State of Illinois.

9. The president of 1st Midwest Financial, Inc. is Defendant Kendall Murphy. Despite its name, 1st Midwest Financial, Inc. has no relationship with First Midwest Bank (First Midwest Bancorp, Inc.) the widely known, publicly traded commercial banking and financial services institution that carried the name until it was acquired by Old Republic Bank in 2022.

10. Defendant First National Financial Inc. is an Illinois Corporation and a citizen of Illinois in that its principal place of business is in Illinois.

11. Defendant Kathleen Long ("Long") is a citizen of Illinois and the President and Secretary of Defendant First National Financial, Inc. On information and belief and at all times relevant herein, Long was the cohabitant and paramour of Chojnacki.

12. Defendant Chase Real Estate, LLC ("Chase Real Estate") is an Illinois Limited Liability Company with its principal place of business in the State of Illinois. The manager, and, on information and belief, the sole member of Chase Real Estate, is Christian Chase, a citizen of Illinois.

13. Defendant FNBO Property Management LLC (FNBO) is an Illinois Limited Liability Company managed by Lukasz Mikosz, Defendant Mikosz's husband. FNBO is a citizen of Illinois in that all the members of FNBO are citizens of Illinois.

14. Defendant Rachel Irwin is an attorney licensed to practice law in the State of Illinois and a citizen of Illinois.

3

15.     "Flip Chicago" appears to have been an un-incorporated enterprise organized by Chojnacki which held itself out as a real estate investment company for the purposes of inducing and capitalizing from out-of-state investors in connection with Illinois real estate.

16.     Defendants Chojnacki, Mikosz, Mainstreet Management, and EJ Investment Group all operate out of the same office space located at 25-41 E. Main Street Suite 204, Roselle, IL 60172.

## ALLEGATIONS COMMON TO ALL COUNTS

### Part I of the Fraud: Luring the Investor – Chase Real Estate Services and "Flip Chicago"

17.     Rick, Thomas, Tony, and Harry are friends who all reside in the San Francisco Bay area of California.   Working professionals, they wanted to invest in real estate to create extra funds for college expenses and other family expenses.

18.     In December 2021, Rick saw an advertisement on social media inviting the reader to contact Chase Real Estate Services also known as "Flip Chicago" which identified itself as a system for real estate investment.

19.     Specifically, Flip Chicago, a/k/a Chase Real Estate Services, promised to assist the investor in the purchase of residential real estate (single family homes) and then provide post-closing services relative to renovating the property so that it could be quickly resold at a profit (or "flipped").

20.     Rick sent a query to "Flip Chicago" / Chase Real Estate Services in response to the advertisement.

21.     Rick's query prompted a response from Defendant Mikosz.  The response from Mikosz evolved into sustained text and phone interactions through which Mikosz drew Rick into the scheme giving rise to this action.

4

22.     Mikosz told Rick that she was a real estate broker with Chase Real Estate LLC. Mikosz told Rick that "Flip Chicago" is the same company as Chase Real Estate LLC.

23.     Mikosz actively led Rick to believe that since she would represent him as an agent of Chase Real Estate, and because "Flip Chicago" is the same company as Chase Real Estate, that the transactions would be safely negotiated and consummated under the auspices of Chase Real Estate. Mikosz told Rick that her managing broker was Chojnacki, also a Chase Real Estate agent.

24.     At all times relevant herein, the website for Flip Chicago was very similar to the website for Chase Real Estate (See printed copy of the Flip Chicago website attached as Exhibit 1 and the Chase Real Estate Website at Exhibit 2).

25.     The Chase Real Estate and Flip Chicago websites include many photos of the same persons – including Chojnacki and Mikosz.  The professional portrait photographs of Chojnacki and Mikosz are precisely the same photographs on both the Flip Chicago and the Chase Real Estate websites.  (See Exhibits 1 and 2).

26.     Mikosz and Chojnacki attended a video session with Rick where Chojnacki and Mikosz encouraged him to work with Chase Real Estate and Flip Chicago.

27.     Chojnacki stressed to Rick that they "do it all."  Chojnacki and Mikosz told Rick that he did not have to worry about anything, they are a "one stop shop."

28.     Mikosz told Rick that the property flips could be done quickly because the properties they would find for him were in a suitable condition to allow reasonable renovations within a short timeframe.

29.     Mikosz stressed many times to Rick that "from beginning to end, the flips will take less than six months."

30.     Mikosz told Rick that a key component in the Chase Real Estate service that they would provide to him would be assistance in locating and making offers on suitable investment properties.

31.     Rick told Mikosz that he had friends who would want to purchase the properties with him.  Rick, Thomas, Tony, and Harry ("Plaintiffs") together ultimately purchased the subject properties via their jointly owned Limited Liability Companies.

32.     Rick told Mikosz that he would be the point of contact for the group during the transactions and negotiations.

**Part II of the Fraud: The REO and Imposter Bank Seller**

33.     Mikosz told Rick that Plaintiffs would be purchasing single family homes from banking institutions which had foreclosed on the previous owners/borrowers.

34.     Mikosz represented that the properties were Real Estate Owned (REO) properties.

35.     REO is a term of art referring to a lender-owned property that went unsold at a foreclosure auction. Properties become REO when borrowers default and the lender repossesses and attempts to sell them.  The lender bank takes ownership of a foreclosed property when it fails to sell at auction at the amount sought to cover the loan. These REO properties are generally understood to be attractive to certain investors because they can be acquired from the foreclosing bank at a significantly discounted price.

36.     Mikosz assured Rick that all of the properties Plaintiffs would be making offers on were REO properties being offered for sale by the REO bank.

37.     Accordingly, a significant component to the investment was the discounted price for which the property could be acquired at from the foreclosing bank.

6

38.     Mikosz specifically represented that she would assist Plaintiffs in crafting an appropriate offer to the REO bank.

39.     She assured Rick that she and her company had an ongoing professional relationship with these banks, and therefore that would be a reason to expect respectable treatment during the offer process.

40.     The truth was that the seller of the property was not an REO bank, but rather a corporation owned by an affiliate of Mikosz and Chojnacki, with a deceptive and deliberately misleading name ("1st Midwest Financial, Inc.").

**The Imposter Bank:  1st Midwest Financial, Inc.**

41.     Despite its misleading name, Defendant 1st Midwest Financial, Inc., has no affiliation with First Midwest Bancorp., the widely known bank headquartered in Chicago which was one of the largest banking institutions in the United States until its 2022 acquisition by Old National Bank.

42.     Defendant 1st Midwest Financial, Inc. has no banking license or any other financial services credentials.

43.     In furtherance of their overall scheme, Defendants or their affiliates have formed corporations using other major bank names, such as BMO (Bank of Montreal).

44.     Nonetheless, as part of Defendants' overall scheme, 1st Midwest Financial, Inc., posing as a bank, previously acquired (or contracted to acquire) the property from the actual REO bank at the discounted price promised to Rick.

45.     This impostor bank then sold the property to Plaintiffs at an inflated price with the other Defendants acting as their accomplices.

46.     Thus, the primary component of Defendants' fraud scheme was to mislead Plaintiffs into believing they were buying a property at the REO price directly from the REO bank.

47.     The offer and acceptance process that Mikosz and Chojnacki described to Plaintiffs with was a farce.  The purchase price of a property was unilaterally determined by the affiliated Defendants before any so-called offer was crafted and "accepted."

48.     When Plaintiffs actually purchased a property from the imposter bank, they ended up paying an undisclosed mark-up.  Thus, Defendants and their affiliates at the impostor banks which sold the properties to Plaintiffs deprived Plaintiffs of the value of the discount embedded in the promise that the acquisition would be from an REO lender.

49.     This complex of misleading statements, active concealments, deceptive practices and failures to disclose occurred notwithstanding the fact that Mikosz was Plaintiffs' Designated Real Estate Broker and Chase Real Estate was Plaintiffs' Designated Real Estate Brokerage Firm in the purchase transactions.

50.     The impostor bank, 1st Midwest Financial, Inc., states on its corporate filings that its President is Defendant Kendall Murphy. Kendall Murphy's address on the corporate filings is 1046 Midwest Road, Northbrook, Illinois – which is a non-existent address (likely contrived to mislead the public to believe that the "bank" was the vanity namesake for the street, a common practice for very large corporations).   (See Exhibit 3).

51.     When a legitimate address was required for a closing statement or for a deed, 1st Midwest Financial, Inc. provided the address of 30W121 Estes Street in Naperville, Illinois – which was a foreclosure property with an apparently abandoned house near an industrial area in

northwestern Naperville. (See Exhibit 4). As of the filing of this action, this address is a vacant lot.

## The Chicago Heights Property

52.     Following their initial conversations, Mikosz sent Rick information relating to a single-family home at 226 Leonard St., Chicago Heights, Illinois (the "Chicago Heights" property).

53.     Mikosz represented that the Chicago Heights property would be an ideal REO to quickly flip and was a bargain for the purchase price of $117,000.00.

54.     In follow up conversations, Mikosz assured Rick that Plaintiffs would make money on the Chicago Heights property and that it was a great deal.

55.     Throughout the transaction, Mikosz referred to Chicago Heights as an "REO type deal and not a regular seller." (See Exhibit 5).

56.     Plaintiffs believed Mikosz's representations that the Chicago Heights property was an REO because the seller's name – 1st Midwest Financial, Inc., sounded like the bank.

57.     Plaintiffs entered into an agreement to purchase the Chicago Heights property on February 1, 2022. Chase Real Estate is listed on the contract as "Buyer's Designated Brokerage." Mikosz is listed as "Buyer's Designated Agent." 1st Midwest Financial, Inc. is the seller. The real estate contract was conjoined with and appended to the "Chase Real Estate Guide to Investing" (See Chicago Heights Purchase Agreement, attached as Exhibit 6).

58.     On April 29, 2022, Plaintiffs closed on the Chicago Heights Property. The Seller was 1st Midwest Financial, Inc. The purchase price was $117,000.00.

59.     Chase Real Estate received a $4,095.00 commission on the sale of the property.

9

60.     Contrary to the representations of Mikosz, and without any disclosure to Plaintiffs, just ten days earlier, on April 19, Defendant 1st Midwest Financial, Inc. acquired the property from the real REO bank, Deutsche Bank National Trust Company, in the amount of $104,500.00.

61.     Defendant Mikosz and Chojnacki at all times held themselves out to be agents of and acting on behalf of the Plaintiffs.

62.     At no time did Defendant Mikosz or Chojnacki disclose any conflict of interest.

63.     Defendant Mikosz made misrepresentations to Plaintiffs to induce them to consummate the Chicago Heights transaction.

64.     Following the Chicago Heights purchase, Mikosz continued to send advertisements to Plaintiffs for more "REO deals."

### The Aborted Lyons Property Transaction and Wire Gaffe Which Nearly Exposed the Ruse

65.     Mikosz also told Rick about a single-family home at 4120 Elm Ave., Lyons, Illinois (the "Lyons Property"). Mikosz told Rick that the Lyons property was an REO property, that it was a great deal, and that it would be able to be quickly renovated and flipped. Mikosz told Rick that the Lyons property was a "bargain" for the purchase price of $195,000.00.

66.     On April 22, 2022, Plaintiffs entered into a Purchase Agreement to purchase the Lyons Property. Defendant 1st Midwest Financial, Inc. is listed as the Seller. Defendant Chase Real Estate is listed as the Buyer's Brokerage. Defendant Mikosz is listed as the Buyer's designated agent. (See Lyons Purchase Agreement, attached as Exhibit 7).

67.     As in the prior deal, the Seller was not the REO bank but the impostor bank, interposed by the Defendants for the purpose of defrauding the Plaintiffs.

10

68. The subterfuge was nearly discovered by Rick when the title company inadvertently sent him confirmation of Defendant First National Financial, Inc.'s wire when he requested confirmation of receipt of Plaintiffs' earnest money for the Lyons property.

69. Specifically, on or about April 29, 2022, Rick asked the title company to send him confirmation of the earnest money he deposited for the Lyons property.

70. The title company accidentally sent him the wire information for an earnest money deposit for the same Lyons property that was made on that property by Defendant First National Financial, Inc., and specified the wirer's address. (See wire confirmation in Group Exhibit 8).

71. First National Financial, Inc. is an Illinois Corporation owned and controlled by Defendant Kathleen Long, who at all times relevant herein, was Defendant Chojnacki's roommate and paramour. Moreover, at all times relevant herein, Defendant Chojnacki was residing at the address listed in the wire confirmation with Defendant Long.

72. The wire information receipt sent by the title company for the "First Financial Wire" did match the Lyons address but was not from Rick and did not match Rick's banking information. It contained the banking information for First National Financial (See the wire confirmation Exhibit 8).

73. Rick was concerned as to why another party was also putting earnest money down on the Lyons property and so he texted Mikosz:

> **Lori, Lakeland Title was responding to a request for my Earnest money receipt and they provided the info below.**
>
> **The property is the same but the wire transfer is not from me. Can you please let me know why someone would be wiring payment for this property?**

(See text message in Group Exhibit 8).

11

Mikosz responded:

> **Hi Rick! Not sure why others would have it under contract.   All I know its (sic) we have the deal and we (sic) closing on it. Let me dig a bit on this new EM.**

(See response text message attached in Group Exhibit 8).

74.     Mikosz did not need to do any digging; she was precisely aware of the circumstances and that a blunder had occurred. At the time, Mikosz knew that the affiliated Defendants were clandestinely acquiring the property in order to interpose themselves between the REO bank and the misled Plaintiffs to sell at an undisclosed mark-up.

75.     Mikosz was aware that Defendants Chojnacki and Long were residing together at the address on the First Financial Wire – not only because he is her supervising broker at Chase Real Estate but because she also lives only a few houses down from Chojnacki.  Mikosz was also aware that First National Financial, Inc. was Long's company.

76.     Over the course of the next month, Mikosz never provided an answer to Rick as to why "another party" was putting EM down on the Lyons property notwithstanding his following up on the anomaly several times.

77.     Mikosz did not disclose to Rick the conflict of interest relating to the fact that Long, Chase Supervising Broker Chojnacki's cohabitant and paramour, was putting earnest money down on Plaintiffs' Lyons contract at the same time they were contracted to purchase the property.

78.     Subsequent to this wire confirmation gaffe, Mikosz pressured Rick away from the Lyons deal and into another one.

**"Reo Bellwood – Buy Fix and Flip"**

79.     After Rick continued to question Mikosz about why someone else was putting earnest money down on the Lyons property, Mikosz sent information for a property known as 301 Bohland, Bellwood, Illinois (the "Bellwood" property).  (See Exhibit 9).

80.     The advertisement email sent by Mikosz to Rick described the Bellwood property as "REO BELLWOOD – BUY FIX AND FLIP."  (See Exhibit 9).  The advertisement promised an REO purchase price of $225,000, rehab costs of $49,000, and an after-rehab value of $340,000.  The after-rehab profit was listed as "$42,000."  (See Exhibit 9).

81.     Mikosz advised that Plaintiffs should "switch" from the Lyons property to the Bellwood property.  (See Exhibit 10).

82.     Mikosz told Rick that Bellwood would be a "faster flip" than Lyons and told Rick that they could close on Bellwood the following week.  (See Exhibit 10).

83.     When Rick asked Mikosz what to do about Plaintiffs' Lyons' property earnest money, Mikosz told Rick that Plaintiffs' earnest money would simply "transfer" to the Bellwood purchase.  (See text message at Exhibit 10).

84.     Mikosz's representation to Rick that his earnest money for Lyons would simply "transfer" to Bellwood was not in accordance with Paragraph 26 of the Lyons Purchase Agreement.

85.     Despite this, Plaintiffs' earnest money apparently did simply "transfer" on the Chase Real Estate Books to the new Purchase Agreement Rick signed for the Bellwood property on June 13, 2022.

86.     Mikosz assured Rick that, in addition to the Bellwood Property being a "faster flip" than Lyons, she was "100% sure" Plaintiffs would "make money on Bellwood."

13

87.     The June 13, 2022 Purchase Agreement for the Bellwood property identified Chase Real Estate Services as Buyer's Broker and Mikosz as Buyer's designated agent.  The purchase price for the Bellwood property was $220,000.00. (See Exhibit 11).

88.     Mikosz told Rick this was a good deal.  She texted Rick, presumably because she sent him this great deal, that he owed her "another deal purchase :)"  (See text message at Exhibit 12).

89.     Subsequent to this text from Mikosz, Plaintiffs reviewed the real estate listings in the Bellwood area and found they were not consistent with Mikosz's representations.  Rick contacted Mikosz and expressed concerns about the profitability of the Bellwood deal.  Mikosz responded back:

> **Rick, even one bath sells for $300K in Bellwood.  Check the sales I have sent you. We should be making clear $40K.  I know Bellwood very well marketwise.**

(See text message at Exhibit 13).

90.     Plaintiffs were persuaded by Mikosz's advice, after all, they believed she was their agent and was working in their interests.

91.     On June 21, 2022, Mikosz texted Rick:

> **Rick, please let me know about Bellwood. Seller reached out again. We put pressure on them closing because of you going out of town. Now they back to make it work.  Please let me know asap on this. They <u>government agency</u> who I do 100+ deals with them. They potentially will block me of not responding or backing out this late (sic).**

(See text message at Exhibit 14, emphasis added).

92.     Contrary to Mikosz's representations, the "Seller" (Defendant 1st Midwest Financial) was not a "government agency who" Mikosz does "100+ deals with," but instead was owned and controlled by Defendant Chojnacki and Mikosz's affiliate, Kendall Murphy.

93.     Defendants had secretly purchased the Bellwood property from the actual REO Bank, U.S. Bank National Association, on April 14, 2022 for $191,000.00, $29,000 less than the $220,000 they charged Plaintiffs after the bogus negotiation.

94.     Persuaded by Mikosz's pressure, Plaintiffs agreed to move forward with the closing on the Bellwood contract.

95.     Plaintiffs, via their Limited Liability Company as buyer, and 1st Midwest Financial, Inc. as seller, closed on the Bellwood property on June 24, 2022.  The purchase price was $220,000.

96.     Chase Real Estate received a $7,700.00 commission for the sale.

97.     Defendant Mikosz and Chojnacki were and at all times held themselves out to be agents of and acting on behalf of the Plaintiffs.

98.     At no time did Defendant Mikosz or Chojnacki disclose any conflict of interest.

99.     Defendants Mikosz and Chojnacki made misrepresentations to induce Plaintiffs to consummate the Bellwood transaction.

100.    Note that Mikosz' report to Rick as to her farcical arm's-length negotiation with the seller included a statement that she lowered her commission to make the deal work (See Exhibit 12). While the affiliated Defendants did appear to pay commissions one to the other, no such reduction of her commission was required since the price was unilaterally set by the Defendants behind the screen of their ruse.

101.    In any case, it appears that Mikosz did not lower her commission.  The self-same 3.5% commission to Chase Real Estate was charged in this transaction as it was with the other transactions. The false gesture was done only to reinforce the fiction that an actual arms-length negotiation occurred.

**Part III of the Fraud: The Renovations**

102.    Defendant's fraudulent and deceptive practices continued after the closing of the transactions and into the renovations phase.

103.    The fraud and deception came in the form of document forgery, fraudulent billing, and active concealment of the properties' condition (along with the related violations with the municipal requirements).

104.    The point of the purchases was to enable Plaintiffs to quickly flip the properties and sell them at a profit once they had been renovated.  Mikosz and Chojnacki told Rick that, in essence, Chase and Flip Chicago "do everything" with regard to the renovations.

105.    Defendants told Rick that the property flips could be done in a time efficient manner because the properties were in a suitable condition to allow reasonable renovations within a short timeframe.

106.    The renovation period was a key step in the fraud-scheme because it enabled the Defendants to prevent the investor from discovering the impostor bank scam and to prevent the investor from learning the poor condition of the properties.

107.    An understanding of this phase of the scheme requires an understanding of the local rules governing property transfers in certain Illinois municipalities.

**The Forged Bellwood Purchaser's Acknowledgement**

108.    The city of Bellwood regulates transfers of real estate within its boundaries.

109.    In order for Bellwood to approve the Bellwood Property sale to the Plaintiffs, the Defendant needed to pass a Bellwood inspection. If the property did not pass the inspection, the Defendants would have to fix the problems or get the buyer to sign a Bellwood agreement form

whereby the buyer would take responsibility for the violations found in the inspection (this form is called the "Purchaser's Acknowledgement").

110.    On May 6, 2021, the Bellwood property failed a transfer inspection.

111.    Instead of discussing the problem with the Plaintiffs, someone (presumably one of the Defendants) forged the Plaintiff's signature on the Bellwood Purchaser's Acknowledgement. See forged document attached at Exhibit 15.

112.    The forged document was notarized by Defendant Irwin. Irwin and Chen were not in the same state on the date of the signature, June 14, 2022 or at any other time.  Irwin is an Illinois attorney, Chen is a resident of California.

113.    Chen never came to Illinois during any part of these transactions.

114.    Chen never met with Irwin in California or anywhere else.

115.    Forging Chen's signature furthered the Defendants overall scheme in the following ways:

a) It prevented the disclosure of the true condition of the property to the Plaintiffs including the exaggerated good condition that would have explained the inflated price contrived by the Defendants;

b) It prevented the discovery of the Impostor Bank; and

c) It allowed the defendants to surreptitiously pass along repairs that would have been required by them on to the Plaintiffs.

**Fraudulent Billings and Undisclosed Nepotism**

116.    As indicated above, the forged Purchaser's Acknowledgement allowed the Defendants to secretly incorporate the repairs that they were required to do because of the failed Bellwood inspection into the repairs Plaintiffs may have anticipated due to the nature of the transaction.

17

117.    In connection with this portion of the fraud, the Defendants perpetrated a complex scheme of falsified billings and exorbitant charges for poorly performed work.

118.    Notwithstanding Defendants' insistence that their professional management would result in a flip of the properties within months of purchase, the Plaintiffs still own both properties and both are still in violation of the relevant municipal codes – now nearly two years after the transactions.

119.    The Bellwood Property is still simply not in compliance with Bellwood's May 6, 2021 transfer inspection (which was fraudulently concealed) and is thus not habitable or transferable. (See Defendants rejected Bellwood permit application at Exhibit 16)

120.    After significant delays, the Chicago Heights property was rendered habitable. the Plaintiffs have been forced to rent the property to recoup their losses due to the expensive delays, the misrepresented initial equity value, and the change of market conditions.

121.    Defendants have invoiced the plaintiffs over $95,000 in charges for the properties. The invoices generally fail to itemize the work being done to justify the cost. When plaintiffs insisted that the bills be broken down into identifiable work, Mikosz resisted stating that is simply was not how it was done. See e-mail exchange at Exhibit 17.

122.    Specifically, after several rounds deflection with Chen, Mikosz was sent the email at Exhibit 17 by Plaintiff Tang:

> **Also regarding the invoicing, I'm not sure what the disconnect is and why it's difficult for you to provide the details our CPA needs. Again, as a professional PM and GC, providing detailed breakdown of the entire renovation is standard practice and should not be an issue. Can you give us an ETA on the revised invoices?**
>
> **The entire process has been a bit odd to say the least, having done hundreds to thousands of projects, I would have expected a more structured process, transparency, and standard details of renovations.**

To this, Mikosz responded:

> **Regarding invoices, you are asking something we typically do not do, therefor you need to be patience and we will get back to you once they completed. Every invoice paid, has been shared with Rick(the way we have been doing business for year). Making any changes, needs time and crew here in my side.**

123.     Details of the work done was not provided either before or after the above request by Plaintiff Tang.  Any invoicing failed to describe any meaningful way of discerning what precisely supported the amount billed.

124.     Relatedly, and without any disclosure to the Plaintiffs, Mikosz employed a firm owned by her husband to do the purported work.

125.     Attached at a group Exhibit 18 are for work claimed to be performed on the Plaintiffs' properties.

126.     Despite Plaintiffs' payments, the work was either not performed or was performed inadequately so that the Plaintiffs have not been able to resell the properties as promised.

127.     Additionally, Defendant Mikosz failed to disclose a conflict of interest with respect to the work performed and the amounts paid by Plaintiffs in that the work was performed by FNBO Property Management LLC (FNBO), an entity owned and/or controlled by Mikosz's husband.

128.     FNBO is not to be confused the major bank which uses that acronym, First National Bank of Omah.

129.     The principal office given for FNBO on its Illinois Secretary of State corporate filings is 2413 W. Algonquin Rd., Suite 219 Algonquin IL. 2413 West Algonquin Rd. is a UPS store.

130.    The manager of FNBO is Lukasz Mikosz, on information and belief the spouse of Defendant Mikosz.

131.    Defendants failed to disclose this conflict of interest.

132.    Despite paying exorbitant amounts, Plaintiffs have not yet been able to resell the properties, as promised.

133.    Defendants have treated other individuals or entities in the same illegal manner alleged by Plaintiffs.  There are other known specific additional individuals and/or entities who were similarly defrauded by precisely or nearly precisely the same pattern of artifices and fraudulent misrepresentations as set forth in this Complaint.

134.    The Defendants are, at present, continuing to lure investors into the enterprise using the same scheme and under the same guises as those set forth herein. Accordingly, the conduct alleged herein constitutes the Defendants' regular method of conducting their business.

**COUNT I:  RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT (RICO) - 18 U.S.C. 1962(c), (d)**

**(Defendants Chojnacki, Mikosz, 1st Midwest Financial Inc., Kendall Murphy)**

Plaintiffs re-state and re-allege Paragraphs 1 through 134 as though fully stated herein.

**RICO Persons**

135.    Defendants Chojnacki, Mikosz, 1st Midwest Financial Inc., and Kendall Murphy, are each capable of holding a legal or beneficial interest in property, and therefore each is a "person" within the meaning of 18 U.S.C. § 1961(3).

**The Rico Enterprise**

136.    Defendants Chojnacki, Mikosz, 1st Midwest Financial Inc., and Kendall Murphy, were associated in fact, and constituted an "enterprise" as that term is defined in Title 18, United

20

States Code, Section 1961(4), which enterprise was engaged in, and the activities of which affected, interstate commerce. This enterprise shall be referred to herein as the "Flip Chicago Enterprise."

137.    The Flip Chicago Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

138.    The primary purpose of the Flip Chicago Enterprise was to lure and then fleece unsuspecting real estate investors for the financial benefit of Flip Chicago.

139.    For the purpose of 18 U.S.C. § 1962(c), and during the periods relevant to this complaint, said Defendants each had authority within the Flip Chicago Enterprise, and/or conducted or participated, directly or indirectly, in the conduct of the Flip Chicago Enterprise's affairs through the pattern of racketeering activity described herein.

## Effect on Interstate Commerce

140.    The Flip Chicago Enterprise conducted its racketeering activity, in part, using the interstate mails and wire communications, including by use of the telephones, by electronic transfers of funds, and through the mailing of checks.

## Predicate Acts of Racketeering Activity

141.    Through the Flip Chicago Enterprise, or in conspiracy with it, the Defendants conducted, engaged in, and participated in a pattern of racketeering activity, consisting, at a minimum, of the following predicate acts: (a) multiple violations of Title 18, United State Code, Sections § 1341, 1343, and 1346 (mail fraud and wire fraud).  The scheme to defraud was advanced, concealed or furthered by the use of the U.S. mail or wires.

142.     Specifically, the Defendants' predicate acts include, but are not limited to, the following:

    a)  In furtherance of a scheme or artifice to defraud as defined in 18 U.S.C. §§ 1341 & 1346, and with specific intent to defraud, Defendants placed ads on the Internet and on social media with the intent to induce investors to participate in "REO" real estate opportunities when they actually intended to sell the duped investor their own significantly marked-up property.

    b)  Engaging in a sustained fiction with the victim, replete with misrepresentations and calculated omissions to keep the investor misled that their transactional counterparty was an REO bank selling the property directly to the investor at REO level pricing.

    c)  Concealing and misrepresenting known property defects and significant building code and occupancy violations from the investor with the intent of inducing the investor to enter into the transaction.

    d)  Engaging in post-closing fraudulent activity in the management of the property by continued concealment of known property defects, building occupancy and code violations, and fraudulent billing relating to the renovation and flip.

**Pattern of Racketeering Activity**

143.     The Defendants acted, and conspired to act together, and in association with others knowingly and repeatedly committed the above fraudulent acts in furtherance of and for the purpose of enriching themselves financially and to otherwise further the ends of the Flip Chicago Enterprise.

144.     The predicate acts described above were related to one another as part of a common scheme or plan.

145.     Such unlawful conduct constituted a continuous pattern of racketeering activity beginning as early as December 2021, continue through the present, and are likely to continue into the foreseeable future.

## Conspiracy (18 U.S.C. § 1962(d))

### (Defendants Chase Real Estate, FNBO, Rachel Irwin, Kathleen Long and First National Financial, Inc.)

146.    As described above, Chase Real Estate, FNBO, Rachel Irwin, Kathleen Long, and First National Financial, Inc., did knowingly agree to facilitate the Flip Chicago Enterprise Defendants, and those acting in concert with them, to violate 18 U.S.C. § 1962(c) for the purpose of achieving and profiting from the racketeering activities described above.

147.    In furtherance of that agreement, the said Defendants knowingly and intentionally agreed and conspired to commit at least two of the predicate acts set forth above and they did so with the knowledge and intent that such acts were in furtherance of the foregoing pattern of racketeering.

148.    Specifically, the Defendants described herein were either affiliated or controlled by the Flip Chicago Enterprise Defendants

149.    The Defendants described herein knowingly provided auxiliary services with respect to the marketing, negotiation, and transaction of real estate closing services which were necessary to and facilitated the accomplishment of the goals of the Flip Chicago Enterprise.

150.    Defendant Chase Real Estate LLC provided the cover of a legitimate real estate brokerage enterprise, oversaw the conduct and behavior of Mikosz and Chojnacki, and received a commission from 1st Midwest Financial, Inc. (the seller) notwithstanding the fact that at all relevant times herein, they held themselves out as Rick's agent.

### Injuries to the Plaintiff Business and Property

151.    As a direct and proximate cause of the described racketeering activities and violations of 18 U.S.C. § 1962(c), and the described conspiracy in violation of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property. The Defendants'

racketeering activities caused Plaintiffs to invest $327,000 in real estate which the Defendants had actual knowledge was worth far less and said racketeering activities directly resulted and were the proximate cause of Plaintiffs' loss of invested funds. Plaintiffs also spent in excess of $85,000 in renovation costs for work that was either not performed or not performed properly.

152.    The Defendants' racketeering activities further caused Plaintiffs substantial damages due to the fact that the Properties required far more significant repairs at a far greater expense to Plaintiffs than had been previously disclosed to them.

153.    These injuries were a foreseeable consequence of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), and their conspiracy in furtherance of those racketeering violations, in violation of 18 U.S.C. § 1962(d).

**WHEREFORE**, Plaintiffs RICK CHEN, THOMAS LAU, TONY LAU, and HARRY TANG, respectfully request the Court to enter judgment in their favor and against each of the Flip Chicago Enterprise Defendants and their conspirators and order the following relief:

(a) All damages proven pursuant to RICO, trebled as permitted by law;

(b) Punitive damages, attorney fees, and costs as permitted by law; and

(c) Such other and further relief as the Court may deem just and appropriate.

### COUNT II: COMMON LAW FRAUD

154.    Plaintiffs restate Paragraphs 1 through 153 as if fully set forth herein.

155.    Defendant Mikosz and Chojnacki's statements set forth above concerning the sellers of the properties being "REO" banks, the purchase price being a "discount" and/or "REO" price, the condition of the Properties, and their status, were false statements of material fact.

156.    Defendants Mikosz and Chojnacki made the statements with knowledge that they were false.

157.    Defendants Mikosz and Chojnacki made the false statements with the intention to induce Plaintiffs to purchase the Subject Properties under falsified premises.

158.    Plaintiffs reasonably and justifiably relied on the said Defendants' false statements.

159.    Plaintiffs suffered damages due to reliance on the false statements.

160.    Accordingly, the Defendants' statements, Plaintiffs' reliance thereon, and resulting damages constitute common law fraud.

WHEREFORE, Plaintiffs, RICK CHEN, THOMAS LAU, TONY LAU, and HARRY TANG, pray that this Honorable Court enter judgment in his favor and against Defendants in an amount in excess of the jurisdictional limit of Seventy-Five Thousand Dollars ($75,000.00), plus their costs of suit, attorneys' fees, and such other relief as this Court deems just and equitable.

## COUNT III: VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (ILLINOIS CONSUMER FRAUD ACT)

161.    Plaintiffs re-state Paragraphs 1 through 160 above as if fully set forth herein.

162.    Defendants Mikosz and Chojnacki's statements, including but not limited to their statements set forth above concerning the various properties, their "REO" or "bank sold" status, the sellers being "REO" or "bank" sellers, the properties' condition, and the alleged work performed that was either not performed or was performed inadequately and/or not up to code, were false statements of material fact and constituted a deceptive act or practice by the said Defendants.

163.    Defendants Mikosz and Chojnacki intended that Plaintiffs rely on the deception.

164.    The occurrence of the deception was in the course of conduct involving trade and commerce.

165.    The deceptions were originated by residents of Illinois, concern Illinois real estate, and have resulted in violations of Illinois municipal laws.  Accordingly, the conduct alleged herein directly and indirectly affects the State of Illinois.

166.    The deception was the proximate cause of actual damage to Plaintiffs.

167.    Accordingly, the conduct of deception perpetrated by Defendants Mikosz and Chojnacki constitutes a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.

WHEREFORE, Plaintiffs RICK CHEN, THOMAS LAU, TONY LAU, and HARRY TANG, pray that this Honorable Court enter judgment in their favor and against Defendants in an amount in excess of the jurisdictional limit of Seventy-Five Thousand Dollars ($75,000.00), plus their costs of suit, attorneys' fees, and such other relief as this Court deems just and equitable.

### COUNT IV: VIOLATION OF THE ILLINOIS REAL ESTATE LICENSE ACT

168.    Plaintiffs re-state Paragraphs 1 through 167 above as if fully set forth herein.

169.    Defendants Mikosz and Chojnacki provided real estate services in this transaction as agents of Chase Real Estate LLC.

170.    Defendants Mikosz, Chojnacki and Chase Real Estate LLC were "Licensees" under the Real Estate License Act, 225 ILCS 454/1-1 *et seq.*

171.    Section 15-25 of the Real Estate License Act mandates that:

> Licensees shall treat all customers honestly and shall not negligently or knowingly give them false information.

172.    Section 15-5 of the Real Estate License Act specifies that:

> This Article 15 may serve as a basis for private rights of action and defenses by sellers, buyers, landlords, tenants, real estate brokers, and real estate salespersons.

173. Defendants Mikosz, Chojnacki and Chase Real Estate LLC breached the requirements of the Real Estate License Act by committing the following actions:

a) fraudulently misrepresenting that they represented the Plaintiffs as buyer when in actuality they represented, were affiliates of and/or were direct agents of the seller;

b) fraudulently misstating the condition of the Property;

c) fraudulently misstating the tenancy of the Property;

d) fraudulent falsification of the purported rent roll;

e) fraudulently misrepresenting to the Plaintiffs that the seller in the transaction was a directly sourced, off-market seller when in truth the Seller was comprised of, directly affiliated with or controlled by the Defendants themselves or were agents thereof;

f) negligently misrepresenting all the above (a) through (e) to the Plaintiffs.

174. Plaintiffs relied on Defendants Mikosz, Chojnacki and Chase Real Estate LLC's statements and suffered damages therefrom.

WHEREFORE, Plaintiffs RICK CHEN, THOMAS LAU, TONY LAU, and HARRY TANG, pray that this Honorable Court enter judgment in his favor and against Defendants in an amount in excess of the jurisdictional limit of Seventy-Five Thousand Dollars ($75,000.00), plus their costs of suit, attorneys' fees, and such other relief as this Court deems just and equitable.

## COUNT V:  NEGLIGENT MISREPRESENTATION

175. Plaintiffs re-state Paragraphs 1 through 174 above as if fully set forth herein.

176. Defendants Mikosz and Chojnacki's statements, including but not limited to their statements set forth above concerning the various properties, their "REO" or "bank sold" status, the "REO" or "bank" sellers, the properties' condition, their statements regarding the work that

27

was either not performed and/or performed inadequately and/or not up to code, were false statements of material fact, and/or careless statements.

177.    Defendants Mikosz and Chojnacki made the false and/or careless statements through carelessness or negligence in ascertaining the truth of the statement by the party making it.

178.    Defendants Mikosz and Chojnacki's false and/or careless statements were made with intention to induce Plaintiffs to act.

179.    Plaintiffs' actions in consummating the transaction were in reliance on the false and/or careless statements.

180.    Plaintiffs' reliance was the proximate cause of damage to them.

181.    Defendants Mikosz and Chojnacki's statements therefore constitute Negligent Representation.

WHEREFORE, Plaintiff RICK CHEN, THOMAS LAU, TONY LAU, and HARRY TANG, pray that this Honorable Court enter judgment in their favor and against DEFENDANTS in an amount in excess of the jurisdictional limit of Seventy-Five Thousand Dollars ($75,000.00), plus their costs of suit, attorneys' fees, and such other relief as this Court deems just and equitable.

## COUNT VI: UNJUST ENRICHMENT

182.    Plaintiffs reallege and incorporate by reference herein the allegations of Paragraphs 1-181 of this Complaint, as if fully set forth herein.

183.    Defendants did conspire and collude in the undertaking to mislead Plaintiffs into believing they would be acquiring investment property directly from a long-time seller.

184.    Plaintiffs believed and relied on Defendants' scheme of misleading statements and conduct when he agreed to buy the Properties from Defendants, who had secretly already purchased the Properties directly from REO bank for less than the amount that they fraudulently induced Plaintiffs to pay.

185.    Further, Plaintiffs paid Defendants great sums of money to renovate the subject properties in order to flip them in a timely manner.  The work was either not performed and/or was not performed adequately.  Plaintiffs have not been able to flip the properties a year later.

186.    The direct and proximate cause of the Defendants was to deprive the Plaintiffs of the fair bargain they had promised them.

187.    As a consequence of receiving and retaining the difference between the REO price and the fraudulently contrived price and receiving funds from Plaintiffs and either not performing the work or not performing the work adequately, the Defendants have unjustly retained a benefit to the Plaintiffs' detriment, and Defendants' retention of the benefit violates the fundamental principles of justice, equity, and good conscience.

WHEREFORE, Plaintiffs RICK CHEN, THOMAS LAU, TONY LAU, and HARRY TANG, respectfully request the Court to enter judgment in their favor and against each of Defendants and order the following relief:

a)    Payment to the Plaintiffs of the benefit that they received as a consequence of their fraudulent misrepresentations being the difference between the purchase price of the Property paid by Plaintiffs and that paid by themselves or such other amount to be proven at trial;

b)    Return of funds paid by Plaintiffs for renovation of the properties;

c)    Punitive damages, attorney fees, and costs as permitted by law; and

d)    Such other and further relief as the Court may deem just and appropriate.

Respectfully Submitted,

/s/Carmen Gaspero

_____

/s/Lisa Gaspero

_____

Rick Chen
By: His Counsel


Gaspero & Gaspero
Attorneys at Law, P.C.
Carmen A. Gaspero
Lisa M. Gaspero
2001 Butterfield Rd., Suite 1022
Downers Grove, Illinois 60515
630-687-9700