**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RICK CHEN, et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | No. 23 C 2520 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| MARCIN CHOJNACKI, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Rick Chen, Thomas Lau, Tony Lau, and Harry Tang claim Defendants Laurena "Lori" Mikosz and Marcin Chojnacki tricked them into buying two single-family homes at inflated prices. While holding themselves out as Plaintiffs' real-estate brokers, Mikosz and Chojnacki allegedly fed them false assurances about the buildings' condition and resale potential. Behind the scenes, Mikosz's and Chojnacki's associates, the remaining Defendants, through various puppet entities, bought the buildings and resold them to Plaintiffs at a significant markup. Then, Defendants billed Plaintiffs for shoddy renovations. Plaintiffs sued, alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), (d), and various state-law claims. (Dkt. 4). Defendants now move to dismiss. (Dkts. 34, 47). For the reasons below, the motions [34, 47] are denied.

## BACKGROUND

Plaintiffs Rick Chen, Thomas Lau, Tony Lau, and Harry Tang are friends and California residents who hoped to invest in real estate to cover college funds and other family expenses. (Dkt 4 ¶¶ 1–4, 17). In December 2021, Chen saw an advertisement on social media for "Chase Real Estate Services," also known as "Flip Chicago." (*Id.* at ¶ 18). According to the advertisement, Flip Chicago helped investors purchase and then renovate residential real estate to and quickly flip the

1

property for profit. (*Id.* at ¶ 19). Responding to the advertisement, Chen sent a query to Flip Chicago. (*Id.* at ¶ 20). Defendant Lori Mikosz replied from Illinois, telling Chen that she and Defendant Marcin Chojnacki were real-estate brokers with Defendant Chase Real Estate LLC ("Chase RE"), the same company as Flip Chicago. (*Id.* at ¶ 22). Mikosz led Chen to believe that she and Chojnacki, who shared an office in Roselle, Illinois, would represent him as agents of Chase RE, and "the transactions would be safely negotiated and consummated under the auspices of Chase Real Estate." (*Id.* at ¶¶ 16, 23). At the time, the Flip Chicago website was "very similar" to Chase RE's website. (*Id.* at ¶¶ 24–25; *see* Dkts. 4-1, 4-2).

Chen subsequently attended a video session with Mikosz and Chojnacki where Chojnacki touted that Defendants were a "one stop shop," and they "do it all." (Dkt. 4 ¶ 27). Mikosz told Chen that he could buy and flip Real Estate Owned ("REO") properties—foreclosed properties for sale by lending banks at a "significantly discounted price." (*Id.* at ¶¶ 33–35). Mikosz said she would use her professional relationships with REO banks help Plaintiffs craft "an appropriate offer to the REO bank." (*Id.* at ¶¶ 38–39). After purchasing the REO properties, Flip Chicago would help Plaintiffs renovate and flip the properties for a profit. (*Id.* at ¶¶ 19, 28). Mikosz stressed repeatedly that the flips would "take less than six months." (*Id.* at ¶ 29).

Mikosz presented three family homes to Plaintiffs, two of which he later purchased: 226 Leonard Street, Chicago Heights, Illinois (the "Chicago Heights Property"), 4120 Elm Avenue, Lyons, Illinois (the "Lyons Property"), and 301 Bohland, Bellwood, Illinois (the "Bellwood Property"). (*Id.* at ¶¶ 52, 65, 79). The Chicago Heights Property, Mikosz suggested, was an "ideal REO" property to flip at the bargain price of $117,000. (*Id.* at ¶ 53). The February 1, 2022 purchase agreement for the Chicago Heights Property listed Chase RE as the "Buyer's Designated Brokerage," Mikosz as the "Buyer's Designated Agent," and Defendant 1st Midwest Financial,

Inc. ("1st Midwest") as the seller. (*Id.* at ¶ 57; Dkt. 4-6). Throughout the dealings, including in a March 23, 2022 email one month before closing, Mikosz told Chen that the Chicago Heights Property was an "REO type deal," not involving a "regular seller." (Dkt. 4 ¶ 55; Dkt. 4-5). Chase RE received $4,095 as a commission at closing. (Dkt. 4 ¶ 59).

Mikosz next presented the Lyons Property as a "bargain" at the purchase price of $195,000. (*Id.* at ¶ 65). When Chen asked the title company to send confirmation of Plaintiffs' earnest money for the Lyons Property, the title company inadvertently sent confirmation from another buyer, Defendant First National Financial, Inc. ("First National")—where Defendant Kathleen Long, who was Chojnacki's roommate and "paramour," served as the president and secretary. (*Id.* at ¶¶ 11, 68–70). When confronted in an April 29, 2022 text-message exchange with Chen, Mikosz deflected, saying she would look into the earnest-money discrepancy while assuring Chen that "we have the deal and we [sic] closing on it." (*Id.* at ¶ 73; Dkt. 4-8). But Mikosz never explained the anomaly; instead, she steered Plaintiffs away from the Lyons Property and toward the Bellwood Property. (*Id.* at ¶¶ 76–79).

On March 28, 2022, Mikosz emailed Chen a listing for the Bellwood Property, showing its purchase price as $225,000, its renovation costs as $49,000, its resale value as $340,000, and an estimated profit of $42,000. (*Id.* at ¶ 80; Dkt. 4-9). Through text messages in June 2022, Mikosz pushed Chen to "switch" from the Lyons Property to the Bellwood Property, which would "be a faster flip." (Dkt. 4 ¶¶ 81–82; Dkts. 4-10, 4-12, 4-13, 4-14). Mikosz was "100% sure" that Plaintiffs would "make money on Bellwood," she assured Chen. (Dkt. 4 ¶ 86; Dkt. 4-12). Plaintiffs' earnest money, Mikosz told Chen, would "transfer" to the new property—which was inconsistent with the Lyons purchase agreement. (Dkt. 4 ¶¶ 83–85). Although Chen was hesitant about the Bellwood Property's profitability, Mikosz insisted that Plaintiffs "should be making clear

$40K" and asked Chen to trust her. (*Id.* at ¶ 89; Dkt. 4-13). Believing Mikosz, Plaintiffs purchased the Bellwood Property for $220,000 on June 13, 2022. (Dkt. 4 ¶¶ 85, 87, 94). Chase RE received a $7,700 commission. (*Id.* at ¶ 96).

Unbeknownst to Plaintiffs, they had not purchased foreclosed properties from REO banks. (*Id.* at ¶¶ 60, 93). While 1st Midwest bears a similar name to First Midwest Bank, the entities are unrelated, and 1st Midwest has no banking license. (*Id.* at ¶ 42). Rather, 1st Midwest, posing as First Midwest Bank, is an Illinois corporation headed by Defendant Kendall Murphy, an affiliate of Chojnacki. (*Id.* at ¶¶ 41, 50). Although its corporate filings list a "non-existent address" on "Midwest Road" in Northbrook, Illinois, (*id.*; Dkt. 4-3), the closing documents list 1st Midwest's address as "30W121 Estes Street in Naperville, Illinois," a foreclosure property. (Dkt. 4 ¶ 51; *see* Dkt. 4-4). 1st Midwest purchased the Chicago Heights Property and the Bellwood Property from REO banks for $104,500 and $191,000, respectively, before reselling them to Plaintiffs. (Dkt. 4 ¶¶ 60, 93).

During renovations after closing, Plaintiffs discovered violations of municipal requirements. (*Id.* at ¶ 103). For example, Plaintiffs learned that the Bellwood Property failed the Village's inspection on May 6, 2022. (*Id.* at ¶¶ 110; Dkt. 4-16). Instead of discussing the failed inspection with Plaintiffs, someone forged Chen's signature on the waiver, which Defendant Rebecca Irwin notarized. (Dkt. 4 ¶¶ 111–12; *see* Dkt. 4-15). Chen had never met Irwin. (Dkt. 4 ¶ 114). Nor had Chen ever visited Illinois during the transactions. (*Id.* at ¶ 113).

Moreover, without telling Plaintiffs, Mikosz hired her husband's firm, Defendant FNBO Property Management LLC ("FNBO")—which Mikosz either affiliated with or controlled—to complete the repairs. (*Id.* at ¶¶ 124–27; Dkt. 52 at 2).[1] Between June 24 and September 20, 2022,

---

[1] Plaintiffs supplemented their allegations concerning FNBO in response to its motion to dismiss. (*See* Dkt. 52 at 2–5).

FNBO and Mikosz invoiced Plaintiffs over $95,000 for repairs that should have been completed before the transfer, according to the pre-sale inspection. (Dkt. 4 ¶¶ 121, 125; Dkt. 4-18; Dkt. 52 at 4). But the necessary work was either not completed or was done haphazardly. (Dkt. 4 ¶ 126). By February 27, 2023, the Village of Bellwood had repeatedly rejected Defendants' applications to renovate the Bellwood Property, and it is still not in compliance with the May 2022 pre-sale inspection. (*Id.* at ¶ 119; Dkt. 4-16). Further, Mikosz resisted Plaintiffs' request for an itemized breakdown of renovation costs, saying it was "something we typically do not do." (Dkt. 4 ¶ 122; Dkt. 4-17). The post-closing renovation antics, Plaintiffs allege, prevented them from discovering the condition and ownership of the Bellwood Property. (Dkt. 4 ¶¶ 115–17; Dkt. 52 at 2, 4–5). Defendants have tried to "repeat the scam" by offering Plaintiffs additional properties. (Dkt 4 ¶ 131). Defendants have allegedly scammed other investors like Plaintiffs. (*Id.* at ¶¶ 132–33).

Plaintiffs filed this suit in April 2023. (Dkt. 4).[2] In Count I of the Complaint, Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(c), (d). (*Id.* at ¶¶ 135–53). Count II is a common-law fraud claim against Mikosz and Chojnacki. (*Id.* at ¶¶ 154–60). Count III alleges that Mikosz and Chojnacki violated the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/1 *et seq*. (*Id.* at ¶¶ 161–67). Count IV alleges that Mikosz, Chojnacki, and Chase RE violated the Illinois Real Estate License Act (IRELA), 225 ILCS 454/1 *et seq*. (*Id.* at ¶¶ 168–74). Count V brings a negligent-misrepresentation claim against Mikosz and Chojnacki. (*Id.* at ¶¶ 175–81). Last, Count

---

[2] This is one of eleven related actions proceeding before this Court. *See* Amended Complaint, *Malik v. Prairie Raynor LLC*, No. 23-cv-01182 (N.D. Ill. Mar. 2, 2023); Complaint, *Shankar v. Fairview Ave. Props. LLC*, No. 23-cv-01469 (N.D. Ill. Mar. 9, 2023); Complaint, *Abbas v. Mikosz*, No. 23-cv-01691 (N.D. Ill. Mar. 17, 2023); Complaint, *Sor v. TCF Nat'l Holdings, Inc.*, No. 23-cv-02401 (N.D. Ill. Apr. 18, 2023); Complaint, *Michel v. Chojnacki*, No. 23-cv-02546 (N.D. Ill. Apr. 24, 2023); Complaint, *Said v. Chojnacki*, No. 23-cv-02858 (N.D. Ill. May 5, 2023); Amended Complaint, *Haynes v. Fairview Ave Props. LLC*, No 23-cv-01596 (N.D. Ill. May 16, 2023); Complaint, *Stafford v. Chojnacki*, No. 23-cv-03173 (N.D. Ill. May 19, 2023); Complaint, *Hui v. Chojnacki*, No. 23-cv-03430 (N.D. Ill. May 31, 2023); Complaint, *Fernandez v. Chojnacki*, No. 23-cv-04406 (N.D. Ill. July 7, 2023).

VI brings an unjust enrichment claim against all Defendants. (*Id.* at ¶¶ 182–87). Chase RE, joined by the remaining Defendants, moves to dismiss the Complaint for failure to state a claim. (Dkt. 34; *see also* Dkts. 36–40). In addition to joining Chase RE's motion, FNBO moves separately to dismiss for failure to state a claim. (Dkt. 47).

## LEGAL STANDARD

To survive a 12(b)(6) motion to dismiss for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Russell v. Zimmer, Inc.*, 82 F.4th 564, 570 (7th Cir. 2023) (quoting Fed. R. Civ. P. 8(a)(2)). Thus, "a plaintiff must allege 'enough facts to state a claim that is plausible on its face.'" *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)). The Court accepts the well-pleaded factual allegations in the plaintiff's complaint as true, "drawing all reasonable inferences in his favor." *Id.* (citing *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016)).

For claims sounding in fraud, Federal Rule of Civil Procedure 9(b) requires plaintiffs to "state with particularly the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Thus, a plaintiff must "describe the 'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'" *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009)).

**DISCUSSION**

**I.    Racketeer Influenced and Corrupt Organizations Act (RICO) (Count I)**

In Count I, Plaintiffs allege that Chojnacki, Mikosz, 1st Midwest, and Murphy (collectively, "the § 1962(c) Defendants") violated § 1962(c), (Dkt. 4 ¶¶ 135–145), while the remaining Defendants Chase RE, FNBO, Irwin, Long, and First National (collectively, "the § 1962(d) Defendants") violated § 1962(d), (*id.* at ¶¶ 146–150). Defendants challenge Plaintiffs claims under both subsections. Before diving into the RICO allegations, it is worth noting that the complaints in the ten related cases pending before this Court—all describing similar schemes to defraud other plaintiffs by the same or similar defendants[3]—give Plaintiffs' claims a plausibility boost. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011) ("It is appropriate to accord limited corroborative weight to allegations in another's lawsuit.").

**A.    Section 1962(c)**

Under § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1964(c) "empowers private parties to bring lawsuits against those engaged in racketeering activity when that activity has caused them harm." *Armada (Singapore) PTE Ltd. v. Amcol Int'l Corp.*, 885 F.3d 1090, 1093 (7th Cir. 2018) (citing *Rotella v. Wood*, 528 U.S. 549, 557 (2000)). To state a claim under § 1962(c), a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Cedric*

---

[3] *See* Amended Complaint, *Malik*, No. 23-cv-01182; Complaint, *Shankar*, No. 23-cv-01469; Complaint, *Sor*, No. 23-cv-02401; Complaint, *Abbas*, No. 23-cv-01691; Complaint, *Michel*, No. 23-cv-02546; Complaint, *Said*, No. 23-cv-02858; Amended Complaint, *Haynes*, No. 23-cv-01596; Complaint, *Stafford*, No. 23-cv-03173; Complaint, *Hui*, No. 23-cv-03430; Complaint, *Fernandez*, No. 23-cv-04406.

*Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001); *accord Sabrina Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 587–88 (7th Cir. 2017).

### 1. Conduct of an Enterprise

A plaintiff's first step under § 1962(c) is to identify an "enterprise." *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853 (7th Cir. 2013) (citation omitted). An "enterprise" means "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *see also Walgreen*, 719 F.3d at 853 (observing that the statutory definition of "enterprise" is construed broadly). An "association-in-fact" enterprise has "three structural features: [1] a purpose, [2] relationships among those associated with the enterprise; and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009); *Sabrina*, 869 F.3d at 588. Put simply, this type of enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle*, 556 U.S. at 946 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

Separate from the RICO enterprise, the plaintiff must point to a "person"—that is, the defendant. *Walgreen*, 719 F.3d at 853 (citing *Cedric Kushner*, 533 U.S. at 161); *see also Baker v. IBP, Inc.*, 357 F.3d 685, 692 (7th Cir. 2004) ("Without a difference between the defendant and the 'enterprise' there can be no violation of RICO."). "[T]hat 'person' must have conducted or participated in the conduct of the *enterprise's* affairs, not just its own affairs." *Walgreen*, 719 F.3d at 854 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)) (cleaned up). In this context, conduct refers to a defendant's operation or management of the enterprise. *See Sabrina*, 869 F.3d at 589 (citing *Reves*, 507 U.S. at 179).

8

Here, Plaintiffs have sufficiently pleaded an association-in-fact enterprise with purpose, relationships, and longevity. They allege that the § 1962(c) Defendants—which no one disputes are RICO "persons"—"were associated in fact" as the "Flip Chicago Enterprise." (Dkt. 4 ¶ 136). That enterprise's "primary purpose . . . was to lure and then fleece unsuspecting real estate investors" for financial gain. (*Id.* at ¶ 138). To ensure the Flip Chicago Enterprise's profit at the expense of investors like Plaintiffs, its members allegedly worked on both sides of real-estate transactions. Mikosz and Chojnacki worked together from their shared office, doing business as Flip Chicago. After drawing Plaintiffs in with promises of too-good-to-be-true investment opportunities, Mikosz and Chojnacki purported to represent Plaintiffs as real-estate brokers in his purchase of the Properties. Mikosz promised Chen that Flip Chicago could help Plaintiffs buy, renovate, and flip houses in less than six months, and she encouraged Plaintiffs to trust her numerous and repeated misstatements about the Properties' condition and profitability. Defendants' ruse as to the Lyons Property almost unraveled when Plaintiffs discovered that Long (Chojnacki's paramour and roommate), through First National, had put down earnest money on the property. Mikosz played down this discrepancy and steered Plaintiffs toward Belwood, a "faster flip" and "100% sure" to be profitable. (Dkt. 4 ¶¶ 82, 86). While Plaintiffs agreed to buy the Chicago Heights and Bellwood Properties for $337,000, Murphy (Chojnacki's affiliate), through 1st Midwest, purchased the Properties for $295,500 from the actual REO banks and resold them to Plaintiffs at a $41,5000 profit.

The fraud continued after closing because Plaintiffs relied on Flip Chicago for renovations. Despite Defendants' representations that the Properties were in good enough condition to allow quick flips, both Properties faced undisclosed building and municipal violations that were never remedied. Plaintiffs received invoices that failed to itemize the work performed; the renovation

projects were either never completed or haphazardly done. Without Plaintiffs' knowledge, Defendants funneled their renovation funds to Mikosz's husband's company FNBO. When the Bellwood Property failed a property-transfer inspection, someone forged, and Irwin notarized, Chen's signature onto a waiver form acknowledging the failed inspection.

The sophisticated coordination and relationships among Defendants on both sides of Plaintiffs' purchases reflect "an unusual degree of economic interdependence" that helps nudge the existence of the Flip Chicago Enterprise across the plausibility threshold. *See Bible v. U.S. Aid Funds, Inc.*, 799 F.3d 633, 656 (7th Cir. 2015); *see also, e.g.*, *Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384, 388–89 (7th Cir. 2010) (holding that the plaintiff adequately alleged an enterprise by pointing to a coordinated fraudulent scheme); *cf. Walgreen*, 719 F.3d at 855 ("RICO does not penalize parallel, uncoordinated fraud." (citing *Boyle*, 556 U.S. at 947 n.4)). Indeed, that coordination appears essential to the success of the alleged scheme. Rather than "a run-of-the-mill commercial relationship where each entity acts in its individual capacity to pursue its individual self-interest," therefore, the Flip Chicago Enterprise looks more like a "truly joint enterprise where each individual entity acts in concert with the others to pursue a common interest." *See Bible*, 799 F.3d at 655–56. Moreover, the alleged Flip Chicago Enterprise lasted long enough for its members to pursue the enterprise's purpose of attracting investors and profiting from their purchases and renovations. *See Walgreen*, 719 F.3d at 853 (citing *Boyle*, 556 U.S. at 946). After Plaintiffs closed on the Properties, Defendants charged Plaintiffs for shoddy work. Defendants have allegedly scammed other investors like Plaintiffs.

Defendants contend that Plaintiffs have failed to plead a distinct enterprise because there is "complete identity between the alleged 'persons' and the alleged members of the 'enterprise.'" (Dkt. 35 at 6); *see Baker*, 357 F.3d at 692. This argument rests on the mistaken view that an

enterprise's members cannot be named as defendants. Of course, an entity cannot be liable under RICO for "operat[ing] *itself* unlawfully." *See Baker*, 357 F.3d at 691–92; *Walgreen*, 719 F.3d at 854; *see also Haroco, Inc. v. Am. Nat'l Bank & Tr. Co. of Chi.*, 747 F.2d 384, 402 (7th Cir. 1984), *aff'd on other grounds*, 473 U.S. 606 (1985). Yet, a plaintiff may state a RICO claim against each member of an association-in-fact enterprise. *See Haroco*, 747 F.2d at 401 ("Where persons associate 'in fact' for criminal purposes . . . each person may be held liable under RICO for his, her, or its participation in conducting the affairs of the association in fact through a pattern of racketeering activity.").

To satisfy RICO's distinctness requirement, the enterprise can "be either formally (as when there is incorporation) or practically (as when there are other people besides the proprietor working in the organization)" separate from the "person." *McCullough v. Suter*, 757 F.2d 142, 144 (7th Cir. 1985); *see also Cedric Kushner*, 533 U.S. at 162–63 ("The corporate owner/employee, a natural person is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that." (citing *McCullough*, 757 F.2d at 144)). Plaintiffs' allegations suggest that the Flip Chicago Enterprise is distinct from each of the § 1962(c) Defendants who served as members. Unlike the enterprise's members—who are "persons," capable of holding property—the Flip Chicago Enterprise is a network of individuals and entities, associated in fact, and thus unable to "hold any interest in property or even be brought into court." *See Haroco*, 747 F.2d at 401. Accordingly, Plaintiffs have alleged the existence of a distinct enterprise.

Plaintiffs have also plausibly alleged that the § 1962(c) Defendants participated in operating or managing the Flip Chicago Enterprise's affairs. *See Sabrina*, 869 F.3d at 589 ("[T]o satisfy the 'conduct' element, a plaintiff must allege that the defendant participated in the operation

11

or management of the enterprise itself, and that the defendant played some part in directing the enterprise's affairs." (quoting *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727–28 (7th Cir. 1998))) (cleaned up); *Reves*, 507 U.S. at 179; *see also Bible*, 799 F.3d at 657. The precise hierarchy of the Flip Chicago Enterprise may be unclear. Yet, Plaintiffs have alleged that Chojnacki and Mikosz, through Flip Chicago, attracted and purported to represent unwitting investors while Long and Murphy, through 1st Midwest and First National, purchased and resold properties to those investors. These allegations permit a reasonable inference that the § 1962(c) Defendants held leadership roles and took part in directing the enterprise.

### 2. Pattern of Racketeering Activity

A pattern of racketeering activity requires the completion of at least two predicate acts within ten years. *Bible*, 799 F.3d at 659; 18 U.S.C. § 1961(5). The two violations "must exhibit continuity plus relationship. Related predicate acts have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Sabrina*, 869 F.3d at 589 (quoting *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 828 (7th Cir. 2016)) (cleaned up); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). "Continuity is 'centrally a temporal concept.'" *Empress*, 831 F.3d at 828 (quoting *H.J.*, 492 U.S. at 242). Analytically, "'[c]ontinuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* (quoting *H.J.*, 492 U.S. at 241).

While Defendants do not challenge Plaintiffs' satisfaction of the relationship-plus-continuity test, they argue that Plaintiffs have failed to adequately plead predicate acts. (Dkt. 35 at 6–9). As predicate acts, Plaintiffs allege mail and wire fraud in violation of 18 U.S.C. §§ 1341 and

1343. (Dkt. 4 ¶¶ 141–42). "The elements of mail fraud are: (1) the defendant's participation in a scheme to defraud; (2) defendant's commission of the act with intent to defraud; and (3) use of the mails in furtherance of the fraudulent scheme." *Bible*, 799 F.3d at 657 (quoting *Williams v. Aztar Ind. Gaming Corp.*, 351 F.3d 294, 298–99 (7th Cir. 2003)) (cleaned up); 18 U.S.C. § 1341. Wire fraud has the same elements, except that the defendant must use interstate wires instead of mail to further the scheme. *Bible*, 799 F.3d at 657 (citing *United States v. Green*, 648 F.3d 569, 577–78 (7th Cir. 2011)); 18 U.S.C. § 1343.

Plaintiffs' allegations of mail and wire fraud are subject to Rule 9(b)'s particularity requirement. *See Bible*, 799 F.3d at 658; Fed. R. Civ. P. 9(b). At a minimum, therefore, Plaintiffs must "describe the two predicate acts of fraud with some specificity and state the time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations." *Bible*, 799 F.3d at 658 (quoting *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001)). Yet, Rule 9(b) does not demand "form for form's sake": "although 'plaintiffs are not absolutely required to plead the specific date, place, or time of the fraudulent acts,' they still must 'use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *Pirelli*, 631 F.3d at 442 (internal quotation omitted). The requisite level of detail may vary from case to case. *Id.* (citing *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1324 (7th Cir. 1998)). Since "fair notice is the 'most basic consideration underlying Rule 9(b),' in a case involving multiple defendants, 'the complaint should inform each defendant of the nature of his alleged participation in the fraud.'" *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) (quoting *Vicom, Inc. v. Harbridge Merch. Servs.*, 20 F.3d 771, 777–78 (7th Cir. 1994)).

Plaintiffs allege that "Defendants placed ads on the Internet and on social media with the intent to induce investors to participate in 'REO' real estate opportunities." (Dkt. 4 ¶ 142(a)). Yet, Defendants "actually intended to sell the duped investor their own significantly marked-up property." (*Id.*) Plaintiffs allege further that Defendants engaged in a "sustained fiction," "replete with misrepresentations and calculated omissions" to mislead Plaintiffs into believing that they could buy property directly from an REO bank at a discount. (*Id.* at ¶ 142(b)). Plaintiffs' RICO Count incorporates their previous, more detailed allegations. (*See id.* at 20). While some of these allegations lump Defendants together, others describe the "who, what, when, where, and how" of the fraud.

In December 2021, using wired communication, Mikosz replied to Chen's response to a social media advertisement for Flip Chicago. (*Id.* at ¶¶ 18, 20–21). From Illinois, Mikosz told Chen, in California, that she and Chojnacki were real estate brokers for Flip Chicago, which is the same company as Chase. (*Id.* at ¶¶ 22–23). Mikosz and Chen continued to engage in sustained text and phone interactions. (*Id.* at ¶ 21). In a subsequent video conference, Mikosz and Chojnacki told Chen that Flip Chicago could help him buy properties in suitable conditions to allow for reasonable renovations that would "take less than six months." (*Id.* at ¶¶ 26–30). Mikosz assured Chen that the Chicago Heights Property was an ideal REO property to flip and certain to be profitable for Plaintiffs. (*Id.* at ¶¶ 53–56). In a March 23, 2023 email, Mikosz reiterated that the investment was an "REO type of deal," not involving a "regular seller." (*Id.* at ¶ 55; Dkt. 4-5). Plaintiffs allege Mikosz made these false statements with intent to defraud them. (Dkt. 4 ¶¶ 33–26, 63, 88, 99, 142); *see Bible*, 799 F.3d at 658 (observing that fraudulent intent "may be alleged generally" (citing Fed. R. Civ. P. 9(b))).

Murphy, through the "imposter bank" 1st Midwest, participated in the alleged fraudulent scheme by purchasing the Properties and reselling them to Plaintiffs at inflated prices. (*Id.* at ¶¶ 41–51, 57, 60, 93). Thus, Plaintiffs' well-pleaded allegations add up to at least two plausible instances of wire fraud—a sufficient pattern of racketeering activity. *See Empress*, 831 F.3d at 827 ("Each use of the wires can be an individual count of wire fraud and an individual RICO predicate for the purpose of establishing two predicate acts.").[4] Accordingly, Plaintiffs' § 1962(c) claim survives.

### B. Section 1962(d)

Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). To state a claim under § 1962(d), a plaintiff "must allege that the defendant (1) agreed to maintain an interest in or control of an enterprise, or to participate in an enterprise's affairs, (2) through a pattern of racketeering activity, and (3) that the defendant agreed that some member of the conspiracy (not necessarily the defendant herself) would commit at least two predicate acts in furtherance of those goals." *Domanus v. Locke Lord LLP*, 847 F.3d 469, 479 (7th Cir. 2017) (citing *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011)). Subsection (d)'s concern is "the agreement to participate in an endeavor, which if completed would violate a substantive provision of the Act." *Id.* (citing *Goren*, 847 F.3d at 731–32); *see also Empress*, 831 F.3d at 822–23 ("As with any conspiracy, a RICO conspirator 'must intend to further an endeavor which, if completed, would satisfy all elements of a substantive criminal offense, but it suffices that he would adopt the goal of furthering or facilitating the criminal endeavor.'" (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997))); *Domanus*, 847 F.3d at 479. Here, that substantive provision is subsection (c).

---

[4] Plaintiffs allege that "[t]he Flip Chicago Enterprise conducted its racketeering activity, in part, . . . through the mailing of checks." (*Id.* at ¶ 140).

In Chase RE's motion to dismiss, Defendants argue that Plaintiffs' § 1962(d) claim fails because their § 1962(c) claim is deficient. (Dkt. 35 at 5–6); *see, e.g.*, *Patel v. Mahajan*, 2012 WL 3234397, at *5 (N.D. Ill. Aug. 6, 2012) ("When a § 1962(c) claim fails, a § 1962(d) claim premised on the same facts fails as well." (collecting cases)). Yet, Plaintiffs have stated a claim under § 1962(c). Chase RE's motion raises no other arguments against Plaintiffs' § 1962(d) claim, and the Court declines to invent arguments for Defendants. *See Hicks v. Hepp*, 871 F.3d 513, 531 (7th Cir. 2017) ("Neither the district court nor this court are obliged to research and construct legal arguments for parties, especially when they are represented by counsel." (quoting *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011))).

In addition to joining Chase RE's motion, FNBO challenges Plaintiffs' § 1962(d) claim through a separate motion to dismiss. (Dkt. 47 at 1–2). It argues, with little supporting authority, that Plaintiffs' Complaint alleges "[n]o racketeering activities" by FNBO. (*Id.* at 2). To start, subsection (d) does not require alleging that the defendant committed predicate acts. *See Empress*, 831 F.3d at 823 ("A RICO conspirator need not agree to commit personally two predicate acts in furtherance of the enterprise; rather, he must agree that someone will commit them." (citing *Salinas*, 522 U.S. at 65)). The conspirator need only "knowingly agree to perform services of a kind which facilitate the activities of those who are operating the enterprise in an illegal manner." *Id.* (quoting *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000)).

Plaintiffs' Complaint, with help from their response to the motion to dismiss, (*see* Dkt. 52),[5] sufficiently alleges that FNBO knowingly agreed to facilitate the § 1962(c) Defendants' post-closing fraudulent scheme. Beyond alleging that FNBO operated under Mikosz's husband's

---

[5] Although FNBO's reply makes little effort to grapple with the additional allegations in Plaintiffs' response brief, (*see* Dkt. 55), in opposing dismissal, Plaintiffs were free to "elaborate on [their] factual allegations so long as the new allegations are consistent with the pleadings." *See Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 752 n.2 (7th Cir. 2021) (quoting *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)).

management with Mikosz's affiliation or under her control, Plaintiffs allege that they paid FNBO for renovations that it never completed or performed haphazardly. (Dkt. 4 ¶¶ 124–27; Dkt. 52 at 2–5). Mikosz allegedly concealed her relationship to FNBO while she and FNBO misrepresented its work. (Dkt. 4 ¶¶ 124–27; Dkt. 52 at 2–5). FNBO's part in the scheme, Plaintiffs allege, prevented them from discovering misrepresentations about the Bellwood Property's true condition and ownership. (Dkt. 4 ¶¶ 115–17; Dkt. 52 at 2, 4–5); *see Domanus*, 847 F.3d at 482 ("[W]hen the acts performed by the alleged members of the conspiracy are unlikely to have been done alone, the court may infer agreement." (citations omitted)). In total, these well-pleaded facts permit a reasonable inference that FNBO was "aware of the essential nature and scope of the enterprise and intended to participate in it." *See Domanus*, 847 F.3d at 479 (quoting *United States v. Muskovsky*, 863 F.2d 1319, 1324 (7th Cir. 1988)). Thus, Count I may proceed in its entirety.

## II.     State-Law Claims (Counts II–VI)

In Plaintiffs' remaining claims under state law, they allege common-law fraud (Count II); violation of the ICFA (Count III); violation of the IRELA (Count IV); negligent misrepresentation (Count V); and unjust enrichment (Count VI). (Dkt. 4 ¶¶ 154–87). With scant citations to caselaw, Defendants contend that Counts II through VI sound in fraud, and these claims fail to meet Rule 9(b)'s heightened pleading requirement "for the same reasons" as Plaintiffs' RICO claim. (Dkt. 35 at 9–12). In the same vein, Defendants point out that Plaintiffs' unjust-enrichment claim is "tied to the fate" of their other claims. (*Id.* at 12 (quoting *Vanzant v. Hill's Pet Nutrition*, 934 F.3d 730, 740 (7th Cir. 2019))); *see Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019) ("Under Illinois law, there is no stand-alone claim for unjust enrichment."). Again, Plaintiffs have stated a RICO claim, and the Court need not invent arguments for Defendants. *See Hicks*, 871 F.3d at 531. By failing to develop further arguments on the sufficiency of Plaintiffs'

state-law claims, Defendants have waived any arguments they might have made. *See Wernstein v. Schwartz*, 422 F.3d 476, 477 n.1 (7th Cir. 2005); *Bradley v. Village of University Park*, 59 F.4th 887, 897 (7th Cir. 2023).

## CONCLUSION

For the reasons above, Defendants' Motions to Dismiss [34, 47] are denied in their entirety. Plaintiffs' claims in Counts I–VI may move forward consistent with this Opinion.

Virginia M. Kendall
United States District Judge

Date: December 6, 2023