**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RICK CHEN, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | No. 23 C 2520 |
| v. | ) | |
| | ) | Chief Judge Virginia M. Kendall |
| MARCIN CHOJNACKI, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

**MEMORANDUM OPINION & ORDER**

California residents Rick Chen, Thomas Lau, Tony Lau, and Harry Tang (collectively "Plaintiffs" or "Chen Plaintiffs") brought a complaint alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), (d), and various state-law claims. (Dkt. 106). It is one of 15[1] related cases, all in front of this Court, that Plaintiffs' attorneys have brought alleging that various overlapping Defendants engaged in a fraudulent real-estate investment scheme. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

Over the course of the litigation, numerous defendants settled in all of the related cases. Nonetheless, three separate sets of Defendants filed motions for summary judgment against Plaintiffs: Defendants Kendall Murphy and 1st Midwest Financial, Inc ("Murphy Defendants") (Dkt. 223); Defendants First National Financial, Inc. and Kathleen Long ("Long Defendants") (Dkt. 223); and Defendant Marcin Chojnacki along with related entities (Chojnacki Defendants) (Dkt. 228).

[1] There were as many as 16 related cases, but one, *Ascot Specialty Insurance Company, A Rhode Island Corporation v. Midwest Title & Closing Services LLC et al*, 1:24-cv-05216, settled and closed on December 4, 2025.

In this case, Plaintiffs' Amended Complaint alleged that Chojnacki and the Murphy Defendants violated 18 U.S.C.§ 1962(c), (d), (Dkt. 106 ¶¶ 165–175), while the Long Defendants violated just § 1962(d), (*id.* at ¶¶ 176–185). This is a distinct choice from other related cases, such as *Malik*, where the Plaintiff alleged that the Long Defendants violated "§ 1962(c), (d)." In their Response, however, Plaintiffs' attorneys spend more time rambling through the general grievances animating the 15 related cases than focusing on the specific facts (anchored in the record) as they relate to the Chen Plaintiffs themselves. In doing so, they group the Long Defendants in with the Chojnacki Defendants in their discussion of § 1962(c), (Dkt. 239 at 13–19), seemingly forgetting that nowhere did they allege the Long Defendants to have violated § 1962(c).

It is a well-established principle that "a party may neither amend its pleadings by argument in opposition to summary judgment nor introduce new theories of liability in opposition to summary judgment." *Colbert v. City of Chicago*, 851 F.3d 649, 656 (7th Cir. 2017) (citing *Whitaker v. Milwaukee Cty., Wis.*, 772 F.3d 802, 808 (7th Cir. 2014)). Plaintiffs' Response makes zero reference to a single element of § 1962(d), instead exclusively focusing on § 1962(c) and grouping the Long Defendants in with the other defendants in this case. After the defendant has made its showing, the non-moving party must come forth with evidence showing what facts are in actual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). If the non-moving party fails to do so, summary judgment is proper. *United States v. Selenske*, 882 F.2d 220 (7th Cir.1989). Thus, the Court strikes Plaintiffs' Response to the extent it makes § 1962(c) arguments as to the Long Defendants.

That leaves the remaining motions, which are resolved on the substance. For the below reasons, the Chojnacki Defendants' Motion for Summary Judgment (Dkt. 228), the Long Defendants' Motion (Dkt. 225), and the Murphy Defendants' Motion (Dkt. 223) are granted in

part and denied in part. The Motions are granted with regard to Plaintiff's attempt to proceed under 18 U.S.C. § 1964 on a theory of speculative profit loss; they are otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein and will proceed to trial unless the parties can reach a settlement. The Court also grants summary judgment on all state-law claims as to all Defendants.

## BACKGROUND

The issue with the Long Defendants' briefing is not an anomaly. Related cases in this litigation have already made clear the shortcomings of the present record. To summarize some of the most pertinent issues discussed therein: Plaintiffs' attorneys regularly inserted entire paragraphs worth of fact into their 56.1 Response entries, routinely provided massive string cites that did not justify the stated assertions, and consistently inserted their legal allegations and conclusory assessments—including entire swaths of their expert reports—as statements of "fact," all of which the Court ignored. On multiple occasions in the related cases, the Plaintiffs' attorneys cited to the allegations in the Complaint, rather than admissible evidence, in their 56.1 statements; multiple parties inappropriately admitted facts and then proceeded to provide further information in the response. The Defendants, meanwhile, routinely base their 56.1 statements on the plaintiffs' depositions in these cases and then proceed to object to plaintiffs' own citations to those exact same depositions—often the exact same *portion* of the depositions—as inadmissible hearsay (though this characterization is frequently incorrect under the party-opponent admission exception under Federal Rule of Evidence 801(d)(2)(D)).

As made clear throughout the related cases, this Court has the discretion to deem admitted facts that either side does not expressly admit yet fails to dispute with citations to admissible evidence in the record. *See Dade v. Sherwin–Williams Co.*, 128 F.3d 1135, 1139 (7th Cir. 1997)

(referring to L.R. 56.1's predecessor rule, the court affirmed the district court's taking as true uncontroverted facts alleged in the movant's statement and supported by references to the record); *see also Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) ("It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies."). The Court thus proceeds by crediting only those statements that are adequately supported in the record and relevant to the resolution of the Motions. As explicated in the related cases, Defendants' frequent objections to cited emails on authenticity and hearsay grounds are overruled unless indicated otherwise in the text of the Court's analysis. The few other objections relevant to material facts are addressed below, alongside the relevant facts (that are undisputed unless otherwise indicated).

## I. Background

The Court also, at this point, adopts the general background information established as undisputed in the related cases without repopulating the same record with new citations.[2] That includes the following: (Former defendant) Chase Real Estate, LLC, owned and managed by Christian Chase, provided certain services to brokers for a fee, including allowing the brokers to use the www.mychaseagent.com domain and the mychaseagent.com email. Defendant Marcin Chojnacki ("Chojnacki") is a licensed real estate broker and was the designated managing broker for the Chase RE Roselle branch during the relevant time period. Robert Rixer ("Rixer") was a real estate broker for Chase RE Roselle during the relevant time period. Former Defendant Laurena "Lori" Mikosz also was a real estate broker for Chase RE Roselle during the relevant time period.

[2] The Court does not include the substantial portion of the 56.1 statement that Plaintiffs dedicated to individuals not even named in the present action. (Dkt. 238 ¶¶ 24–34, 44, 47–49).

Chojnacki and Rixer jointly own Market Equities, Inc., a Delaware Corporation formed in 2022; Market Equities, Inc. is the sole owner of Illinois Assets as well as EJ Investments (since 2022) which in turn owns Mainstreet Property Management. Defendant EJ Investments (EJ) was formed by Chojnacki and Rixer in 2020 and was initially owned by Chojnacki and his then-fiancé Long (who also share children); in 2022, Chojnacki and Rixer's Market Equities, Inc., assumed ownership of EJ. Chojnacki's mother, Iwona, is EJ's bookkeeper. Rixer, Chojnacki and Long are signers on the EJ Investment bank account. Rixer and Chojnacki also co-own Citypoint Illinois LLC and have both been brokers there since 2023; Rixer became the managing broker for Citypoint in 2023. The Chojnacki Defendants dispute that Long herself worked for Citypoint any earlier than April 2025. Rixer and Chojnacki also co-owned the now dissolved Illinois Assets LLC.

Long is involved in this action through her alleged involvement in some of the financial entities that Plaintiff argues make up the Citypoint/Citipoint Enterprise: now dissolved Defendant First National Financial (FNF), now dissolved entity Defendant TCF National Holdings (TCF), and Prairie Raynor. Long was the sole shareholder, officer and director of FNF prior to its dissolution on December 20, 2024; she was also the sole signatory on FNF's bank account. Although Rixer and Chojnacki created TCF, Long was the sole shareholder and officer of TCF via FNF; Long was also the sole signatory on the bank account and sole person who had authority to act on behalf of the bank account for TCF, (which Defendants disputed in some cases but admitted on the *Malik* docket (Dkt. 436 ¶ 16), so the Court considers it admitted. Through this organizational structure, Long was the face of TCF; a design that Plaintiff asserts was to conceal Rixer and Chojnacki from the public record, whereas the Chojnacki Defendants assert was a decision made for branding purposes.

Former Defendant Rachel Irwin was an employee of Chojnacki's now dissolved Chojnacki Real Estate, Inc. corporation, and then an employee of former Defendant Midwest Title and Closing Services, which she co-owned with Chojnacki. Irwin was also General Counsel for Rixer and Chojnacki's EJ Investments and a shareholder of XYZABC, Inc., a Delaware corporation that she co-owned with Chojnacki. XYZABC, Inc. was the manager of Midwest Title and Closing Services. Via these entities, Irwin communicated with Chojnacki, Rixer, and Long's lenders, organized entities, prepared operating agreements and bylaws, amendments to bylaws and operating agreements, and other legal documents for Chojnacki, Rixer, Long and their entities; Irwin also acted as "Seller's" attorney for Chojnacki, Rixer, Long and their entities.

This case also features the Murphy Defendants. Murphy was the sole shareholder, President, and Director of 1st Midwest Financial, Inc. ("1st Midwest") (prior to its dissolution) and went to school with Chojnacki. Murphy testified that 1st Midwest's business was to hold title to properties for agents. Murphy views this as a project designed to generate passive income, but Plaintiffs dispute this characterization, arguing that a trier of fact could conclude the purpose was to permit others to shield their identity.

The corporate address initially listed on the Secretary of State's website for 1st Midwest was 1046 Midwest Road, in Northbrook, before being properly corrected to 1046 Midway Road in Northbrook, which the Murphy Defendants contend was a clerical error while Plaintiff argues this was part of a broader scheme to intentionally misstate the address. (Dkt. 236 ¶¶ 4–5). Chen testified that he never met, spoke, communicated with Murphy, and admitted that he has no proof that Murphy, individually, made or provided any of the alleged inaccurate information or misrepresentations communicated to him by his real estate agent, Mikosz and Chojnacki; Chen

testified that he has no proof that Murphy, individually, or 1st Midwest were involved in any of the post-closing repairs alleged in the Complaint. (Dkt. 236 ¶¶ 9–10).

## II. The Chen Plaintiffs

With that, the Court turns to the facts that connect the Chen Plaintiffs with this complicated web of actors. Chen, a California resident, is a real estate investor with a portfolio of numerous properties in Oklahoma, Georgia, and Illinois, some of which he sold at a loss. (Dkt. 237 ¶¶ 3, 14–18). Tang, Lau, and Lau, all also California residents, are Chen's friends and fellow investors who are "silent partners" in the investment and who let Chen take the lead all aspects of procurement and management of the properties. (Dkt. 237 ¶¶ 4–8). This matter arises out of purchases Chen made at 226 Leonard Street in Chicago Heights, Illinois ("Leonard") and 301 Bohland Avenue in Bellwood, Illinois ("Bohland") during the second half of 2021 (collectively referred to as the "Properties"). (Dkt. 237 ¶ 11). During the Properties' subsequent rehab, Chen communicated directly with Chojnacki about future opportunities and acquired an apartment complex that is not a part of this lawsuit. (Dkt. 237 ¶ 36). The Chojnacki Defendants contend that this was the first meeting between Chojnacki and Chen, which Plaintiffs dispute without citation to any earlier interaction. (*Id.*) Chen testified that Mikosz started to "bring [Chojnacki] in" only after he purchased the properties, though maintained that he understood Chojnacki to be a part of the earlier transactions because he saw Chojnacki's name on emails and Mikosz routinely saying she had to run things by Chojnacki. (Dkt. 237 ¶ 46; Chen Dep. 289:11–291:6)

Those purchases began when Chen saw a Facebook advertisement for Chase Real Estate operating in the Midwest, at which point he reached out through the "contact us" form within the ad. (Dkt. 237 ¶¶ 19–20). He testified that he was particularly interested in Chase because they handled most-everything in-house, including property management. (Dkt. 237 ¶ 21).

Mikosz recommended that he target the Leonard property because it was a bank-owned foreclosure that Chen could purchase for well under value and resell within 6 months; intrigued, Plaintiffs signed a purchase agreement through their LLC for cash. (Dkt. 237 ¶¶ 22–24). In this purchase agreement, the seller was listed as FNF and Mikosz was listed as Plaintiffs' agent for the deal. (Dkt. 237 ¶ 25). Chen testified that Mikosz stated that she could help Plaintiffs "flip" the property and that such repairs would take approximately 6-months and cost about $30,000.00, but in the end, Mikosz was only able to secure quotes in excess of $50,000 to complete those same renovations. (Dkt. 237 ¶¶ 26–27).

The Chen Plaintiffs then prepared to move forward on Mikosz' presentation of the Lyons Property, but decided to purchase the Bohland Property instead, in part because Mikosz told Chen that Chase had a better relationship with the Village for the Bohland Property, and that the Bohland Property, an REO, would turn around quicker. (Dkt. 237 ¶¶ 30–31). On June 13, 2022, Chojnacki emailed Mikosz and cc'ed Irwin with the subject line "301 Boland" and asked if Mikosz was "switching [her] buyer to this one." (Dkt. 242 ¶ 61; Dkt. 238 Exhibit 80).

On the Bohland Property, Chen did little due diligence and instead testified that he essentially relied on Mikosz and the Chase team to complete the purchase transaction. (Dkt. 237 ¶ 32).[3] Once again, Mikosz quoted Chen at approximately a $30,000 renovation but ended up with closer to $50,000 worth of repairs. (Dkt. 237 ¶ 33). After being partly done with the renovations, Plaintiffs changed their plans on their own for the Properties from attempting to flip them to attempting to rent them out in order to allow the Properties to appreciate in value. (Dkt. 237 ¶ 34).

[3] Chen also contends that did not know that, while he was working with Mikosz and Chase as his agents, Chojnacki's school friend and CK Construction President Chris Brandonisio won Chojnacki, Murphy and 1st Midwest Financial a lower bid on the Bellwood property; however, his only citation for this allegation is his own conclusory deposition testimony. (Dkt. 242 ¶ 65). "Rule 56 demands something more specific than the bald assertions of the general truth of a particular matter." *Bordelon v. Bd. of Educ. of the City of Chicago*, 811 F.3d 984, 989 (7th Cir. 2016) (citation omitted).

Ultimately, though, after numerous issues with the repairs associated with the Properties actually at issue, Chen fired Mikosz and hired a construction company recommended to him by another Plaintiff in these consolidated cases which continued to increase the cost-overruns on the Properties. (Dkt. 237 ¶¶ 37–38).

Chen later testified that he then discovered that Rachel Irwin (the seller's agent for the Bohland Property) had forged his signature on the Village Inspection report for the Bohland Property, but admitted in the deposition that this was just "an assumption" based on her being the last person to approve it. (Dkt. 237 ¶ 40). Plaintiff refers to this form as the presale inspection report itself, whereas Defendants characterize it as "a one-page municipal form confirming receipt of the Village's pre-sale inspection report and acknowledgement that the purchaser is responsible for any necessary repairs." (Dkt. 242 ¶ 67; Dkt. 238, Exhibit 84). The form, dated May 6, 2022, contains Chojnacki's cell phone number for "Purchaser." (*Id.*) The phone number for "Purchaser" typed on the forged Bellwood Presale Inspection Report was 630-329-7800, which is Marcin Chojnacki's cell phone number. Chen also testified that he realized only later that the Properties were not purchased from banks, but rather from the aforementioned FNF entity (despite the fact that it is undisputed that at least as to the first purchase, the seller was listed as FNF). (Dkt. 237 ¶ 42; Dkt. 237 ¶ 25).

Plaintiffs now bring for the difference in value that FNF purchased each of the Properties for and what Plaintiffs paid for them, as well as costs for lost rents, the costs of repairs to the Properties and some additional expenses (including Mr. Chen's personal cell phone bill). (Dkt. 237 ¶ 43). Regarding his "back-end" damages, Chen identified a bald sum of $167,001, with no computation, backed up only by a spreadsheet purporting to detail Chen's damages simply reiterated the bald sum from his initial disclosures, along with the explanation that the sum

represented "Rent" and "Repairs." (Dkt. 237 ¶ 45 & Exhibit 1). Plaintiffs provide no underlying receipts or calculations. The Chen Plaintiffs also assert "the rehab work was either simply not done or was not done adequately" without any citation to the record. (Dkt. 242 ¶ 75).

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). "A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "[S]peculation and conjecture" also cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

## DISCUSSION

After removing the former Defendants, the remaining landscape of Count I is as follows: Malik alleges that the Chojnacki Defendants, the Murphy Defendants, and the Brandonisio

Defendants violated § 1962(c), and that the Long Defendants violated § 1962(d).[4] Given the fact that the Defendants filed substantively comparable motions for summary judgment in all of the related cases, the Court assumes familiarity with the analysis laid out in *Malik et al v. Prairie Raynor LLC et al*, 23-cv-1182, and related dockets. Indeed, in this case, the Parties regurgitate their arguments with regard to the RICO claims almost verbatim, so the Court need not re-explicate its analysis on the same: there can be no "lost investment bargain" theory of RICO injury where the value of property sold is not as high as represented, but is at least what the Plaintiffs paid for it. On this record, nothing indicates that the Chen Plaintiffs did not get the benefit of their bargain, most certainly not Chen's conclusory opinions that he anticipated making more money on the flips. It is altogether different, however, to allege a RICO violation where the RICO scheme diminishes the actual value of property—in this case, Chen's claims about back-end damages. Defendants contend that the Chen Plaintiffs' claims about additional costs, repairs, and delinquent tenants are insufficient and vague, but those arguments speak not to the validity of a claimed injury for RICO standing purposes and instead go to the scope of damages (if any), a query that is best fit for a jury's resolution. While "logically related, a property interest and a measure of damages are not the same thing." *See Ivar v. Elk River Partners, LLC*. 705 F. Supp. 2d 1220, 1234 (D. Colo. 2010). Thus, Chen's claims can proceed on the alleged financial injuries descending from the representations made around the actual transaction.

A plaintiff's next step under § 1962(c) is to identify an "enterprise." *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853 (7th Cir. 2013) (citation omitted). An "association-in-fact" enterprise has "three structural features: [1]

---

[44] The Complaint says "18 U.S.C. 1962(c), (d)," for these Defendants, but does not discuss the specific conspiracy aspect; nevertheless, the Complaint clearly indicates where the Long Defendants are only facing allegations under § 1962(d).

a purpose, [2] relationships among those associated with the enterprise; and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009); *Sabrina Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 588 (7th Cir. 2017). Put simply, this type of enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle*, 556 U.S. at 946 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). This Court's resolution of the RICO "enterprise" requirement is likewise governed by its previous rulings. The Murphy Defendants, for their part, argue that the Chen Plaintiffs have only established that Murphy is an affiliate of the other co-defendants and thus have not met the requirements for tying them to the enterprise. The Chojnacki Defendants argue on similar grounds, maintaining that any bad acts were Mikosz' alone. (Dkt. 229 at 6).

The contention that either set of Defendants did not participate in the operation or management of the enterprise itself falls flat in light of the significant financial, professional, and personal overlap between the Murphy Defendants and the Chojnacki Defendants. *Sabrina Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 589 (7th Cir. 2017))). A full review of the record, including facts contested and uncontested, could conceivably allow a reasonable jury to find that Chojnacki participated in the operation or management of an enterprise to lure in investors through misrepresentations of building ownership, condition, and—with regard to tenants—its occupancy and rental rates. Further, the Parties' narratives diverge regarding alleged distributions of the profits—including the Murphy Defendants' contributions—in a manner significant enough to send this issue to the jury. (*See, e.g.*, Dkt. 242 ¶¶ 57–58, 63–64, 66). On this heavily disputed record, it is not infeasible for a jury to reasonably find that Murphy, via his 1st Midwest Financial, helped Chojnacki acquire the properties directly from the foreclosing banks, while keeping Chojnacki's name off the deal, in furtherance of the enterprise.

The Murphy Defendants make one additional argument in support of summary judgment as to Count One: that Plaintiffs cannot establish that the Murphy Defendants participated in a scheme to defraud based on the two alleged predicate acts of wire fraud, or that the Murphy Defendants committed the alleged acts with intent to defraud. (Dkt. 223 at 6–7). To refresh: the Murphy Defendants in this case as § 1962(c) Defendants, though seemingly alternatively pleaded § 1962(d) Defendants.

"[T]he substantive offense under § 1962(c) requires two or more predicate acts." *Salinas v. United States,* 522 U.S. 52, 65 (1997). The two violations "must exhibit continuity plus relationship. Related predicate acts have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Sabrina*, 869 F.3d at 589 (quoting *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 828 (7th Cir. 2016)) (cleaned up); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). To prove primary liability for a RICO conspiracy under section 1962(d), however, "the government must prove only that a particular defendant agreed that a member of the conspiracy would commit two predicate racketeering acts, not that the particular defendant committed or agreed to commit two predicate acts himself." *United States v. Benabe*, 654 F.3d 753, 776 (7th Cir. 2011); *United States v. Tello*, 687 F.3d 785, 793 (7th Cir. 2012) ("[M]aking the commission of two or more predicate acts by each conspirator an essential element of the offense . . . would essentially . . . render the conspiracy offense set out in subsection (d) a nullity").

In other words, the law requires only the Murphy Defendants' agreement that some member of the conspiracy would commit at least two acts of racketeering, not that Murphy himself agree to commit such acts. *United States v. Faulkner*, 885 F.3d 488, 492 (7th Cir. 2018)

(racketeering conspiracy charge does not require proof that the defendant was "personally involved in two or more of the predicate acts"); *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655–56 (7th Cir. 2015) ("Our cases have distinguished between two situations: a run-of-the-mill commercial relationship where each entity acts in its individual capacity to pursue its individual self-interest, versus a truly joint enterprise where each individual entity acts in concert with the others to pursue a common interest."). As stated above, the Chen Plaintiffs have accumulated enough evidence to deny this aspect of the Defendants' Motions.

**I. State-Law Claims (Counts II–VI)**

Next, Chojnacki moves for summary judgment on the Chen Plaintiffs' state law claims for common-law fraud (Count II), violation of the ICFA (Count III); violation of the IRELA (Count IV); and negligent misrepresentation (Count V). (Dkt. 229). While this is not the first case in the related litigation in which Plaintiff fails to defend their claims, it is certainly one of the more egregious. Rather than engage with this contention on the substance, Plaintiff recites the general theory of the case with conclusory assessments, which are not sufficient to defeat a proper motion for summary judgment. *First Commodity Traders, Inc. v. Heinhold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir.1985).

Plaintiffs' defense of four counts amounts to two conclusory paragraphs summarizing the Plaintiffs' broad theory of the alleged wrong completely unmoored from any of the elements underlying their state-law claims. (Dkt. 239 at 21–22). Indeed, the Chen Plaintiffs cite not a single case. (*Id.*) Their only support is two vague references to the 56.1 Statement of Fact, one of which contains Plaintiffs' allegation regarding the forged signature at one property, and the other of which asserts Plaintiffs' damages of $176,001.10. Even briefly overlooking the fact that Plaintiffs' attorneys do not make any effort to tie these references to any individual Count, in no way would

they have even come close to creating a disputed issue of material fact. *See United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010) (at the summary judgment stage, it is "not the district court's job to sift through the record and make (a party's) case for him"). As courts have often admonished, "summary judgment is the 'put up or shut up' moment in the life of a case." *See, e.g.*, *In re Airadigm Communications, Inc.*, 616 F.3d 642, 657 (7th Cir.2010). Thus, the Court will not "address those arguments which it finds incomprehensible." *Pope v. United States*, 2012 WL 5389807, at *2 (N.D. Ill. Nov. 1, 2012) (citing *Smith v. Town of Eaton, Ind.*, 910 F.2d 1469, 1470-71 (7th Cir. 1990)).

After the defendant has made its showing, the non-moving party must come forth with evidence showing what facts are in actual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). If the non-moving party fails to do so, summary judgment is proper. *United States v. Selenske*, 882 F.2d 220 (7th Cir.1989). Thus, the motion for summary judgment is also granted as to these state law claims. Chen's wholly unsupported and cursory positions fail as a matter of fact and law.

That leaves the final state-law claim: Count VI: unjust enrichment. All three sets of Defendants moved for summary judgment on Count VI, the only state-law claim pleaded against the Murphy Defendants and the Long Defendants. As they did in *Stafford*, Plaintiffs' attorneys once again incorrectly claim that Defendants' argument "relies entirely" on *Community Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803 (7th Cir. 2018), a case featured in the Murphy Defendants' brief (Dkt. 223 at 7), without acknowledging the case law in the Chojnacki Defendants' brief (Dkt. 229 at 14). Even so, Plaintiffs' contentions are misinformed. As this Court has already spelled out in *Malik*, Illinois law does not consider unjust enrichment an independent cause of action. *See Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir.

2019) (finding no standalone claim for unjust enrichment under Illinois law); *Flores v. Aon Corp.*, 242 N.E.3d 340, 356 (Ill. App. 2023) (quoting *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.*, 484 N.E.2d 349 (Ill. App. Ct. 1985), *aff'd*, 499 N.E.2d 1319 (Ill. 1986)).

"To the extent that the unjust enrichment claim is premised on the ICFA or [common-law fraud] claims, the unjust enrichment claim cannot survive the proper dismissal of those matters." *Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 20 F.4th 311, 324 (7th Cir. 2021). Thus, because the other state-law claims fall, so, too, must Count VI.

**CONCLUSION**

For the below reasons, the Chojnacki Defendants' Motion for Summary Judgment [228], the Long Defendants' Motion [225], and the Murphy Defendants' Motion [223] are granted in part and denied in part. The Motions are granted with regard to Plaintiff's attempt to proceed under 18 U.S.C. § 1964 on a theory of speculative profit loss; they are otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein and will proceed to trial unless the parties can reach a settlement. The Court also grants summary judgment on all state-law claims as to all Defendants.

Virginia M. Kendall
United States District Judge

Date: September 9, 2026